**David McKEE, M.D., Respondent,**

v.

**Dennis K. LAURION, Appellant.**

**No. A11–1154.**

Supreme Court of Minnesota.

Jan. 30, 2013.

Marshall H. Tanick, Teresa J. Ayling, Hellmuth & Johnson, PLLC, Edina, Minnesota, for respondent.

John D. Kelly, David L. Tilden, Hanft Fride, P.A., Duluth, Minnesota, for appellant.

OPINION

PAGE, Justice.

This case presents the narrow question of whether the court of appeals erred in concluding that six allegedly defamatory statements made by appellant Dennis Laurion regarding an encounter with respondent David McKee, M.D., survive summary judgment. We hold that none of the six statements is actionable either (1) because there is no genuine issue of material fact as to the falsity of the statements or (2) because the statements are not capable of conveying a defamatory meaning that would harm respondent's reputation and lower him in the estimation of the community. Therefore, we reverse.

On April 17, 2010, Kenneth Laurion, the father of Dennis Laurion (Laurion), was admitted to St. Luke's Hospital in Duluth after suffering a hemorrhagic stroke. On April 19, Kenneth Laurion was transferred from the intensive care unit (ICU) of St. Luke's to a private room. The attending physician arranged for Dr. McKee, a neurologist, to examine Kenneth Laurion. Dr. McKee had never met Kenneth Laurion before he examined him on April 19.

Three family members were present in Kenneth Laurion's hospital room when Dr. McKee's examination began: Laurion, his mother, and his wife. The examination lasted no longer than 20 minutes, during which time Dr. McKee made certain statements and acted in a manner that, as a whole, the Laurions perceived as rude and insensitive. After Kenneth Laurion had been discharged from the hospital, Laurion posted the following statements regarding Dr. McKee on various "rate-your-doctor" websites:

My father spent 2 days in ICU after a hemorrhagic stroke. He saw a speech therapist and a physical therapist for evaluation. About 10 minutes after my father transferred from ICU to a ward room, Dr. McKee walked into a family visit with my dad. He seemed upset that my father had been moved. Never having met my father or his family, Dr. McKee said, "When you weren't in ICU, I had to spend time finding out if you transferred or died." When we gaped at him, he said, "Well, 44% of hemorrhagic strokes die within 30 days. I guess this is the better option." My father mentioned that he'd been seen by a physical therapist and speech therapist. Dr. McKee said, "Therapists? You don't need therapy." He pulled my father to a sitting position and asked him to get out of bed and walk.[ ] When my father said his gown was just hanging from his neck without a back, Dr. McKee said, "That doesn't matter." My wife said, "It matters to us; let us go into the hall." Five minutes later, Dr. McKee strode out of the room. He did not talk to my mother or myself. When I mentioned Dr. McKee's name to a friend who is a nurse, she said, "Dr. McKee is a real tool!"

Laurion also sent letters to a variety of medically-affiliated institutions complaining about Dr. McKee's conduct. The letters included substantially the same statements communicated in the online postings. According to Laurion, his purpose in sending the letters was to get somebody to tell Dr. McKee (1) that he exhibited "poor behavior" and (2) that the recipients "don't like getting letters like this."

After learning of Laurion's online postings from another patient, Dr. McKee commenced this action against Laurion, asserting claims for defamation per se and interference with business. Dr. McKee's complaint alleged that 11 statements from Laurion's online postings and letters were defamatory. After some discovery, Laurion moved for summary judgment seeking dismissal of Dr. McKee's lawsuit. The district court granted Laurion's motion and dismissed Dr. McKee's claims with prejudice, concluding that, as a whole, the statements lacked defamatory meaning and that, individually, the statements were either protected opinion, substantially true, or too vague to convey a defamatory meaning.

The court of appeals affirmed the district court's dismissal of the interference with business claim, but reversed the district court with respect to six of the allegedly defamatory statements posted online by Laurion. *McKee v. Laurion*, No. A11–1154, 2012 WL 177371, at *6–7 (Minn.App. Jan. 23, 2012). As to those six statements, the court concluded that (1) the statements were factual assertions and not opinions, (2) there were genuine issues of material fact as to the statements' falsity, and (3) the statements tended to harm Dr. McKee's reputation. *Id.* at *2–6. The actionable statements identified by the court of appeals are as follows:

- *Statement 1:* Dr. McKee said he had to "spend time finding out if you [Kenneth Laurion] were transferred or died."

- *Statement 2:* Dr. McKee said, "44% of hemorrhagic strokes die within 30 days. I guess this is the better option."

- *Statement 3:* Dr. McKee said, "You [Kenneth Laurion] don't need therapy."

- *Statement 4:* Dr. McKee said, "[I]t doesn't matter" that the patient's gown did not cover his backside.

- *Statement 5:* Dr. McKee left the room without talking to the patient's family.

- *Statement 6:* A nurse[1] told Laurion that Dr. McKee was "a real tool!"[2]

*Id.* at *6.

We review the district court's grant of summary judgment de novo. *Riverview Muir Doran, LLC v. JADT Dev. Grp., LLC,* 790 N.W.2d 167, 170 (Minn.2010). Our task is to determine whether genuine issues of material fact exist and whether the district court correctly applied the law. *Id.* We view the evidence in the light most favorable to the party against whom summary judgment was granted. *Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993). No genuine issue for trial exists when " 'the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party.' " *DLH, Inc. v. Russ,* 566 N.W.2d 60, 69 (Minn.1997) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

To establish the elements of a defamation claim in Minnesota, a plaintiff must prove that: (1) the defamatory statement was "communicated to someone other than the plaintiff"; (2) the statement is false; (3) the statement tends to "harm the plain-

1. The nurse who allegedly made this statement was not involved in Kenneth Laurion's treatment and has never been identified; she allegedly made the statement to Laurion at a post office after his father had been discharged from the hospital.

2. For ease of discussion, we will refer to the individual statements by their number throughout the remainder of this opinion.

tiff's reputation and to lower [the plaintiff] in the estimation of the community," *Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 919–20 (Minn.2009); and (4) "the recipient of the false statement reasonably understands it to refer to a specific individual." *State v. Crawley*, 819 N.W.2d 94, 104 (Minn.2012).

*Statements 1, 2, & 4*

 Truth is a complete defense to a defamation action and "true statements, however disparaging, are not actionable." *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn.1980). As a general rule, the truth or falsity of a statement is a question for the jury. *Lewis v. Equitable Life Assurance Soc'y of the United States*, 389 N.W.2d 876, 889 (Minn.1986). If the statement is true in substance, minor inaccuracies of expression or detail are immaterial. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (explaining that the common law approach to falsity in the context of libel "overlooks minor inaccuracies and concentrates upon substantial truth"); *see also Clancy v. Daily News Corp.*, 202 Minn. 1, 11, 277 N.W. 264, 269 (1938) (characterizing the question of truth as "[w]hether the publications were substantially true"); Restatement (Second) of Torts § 581A cmt. f (1977) ("Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance."). "Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge [is] justified.'" *Masson*, 501 U.S. at 517, 111 S.Ct. 2419 (quoting *Heuer v. Kee*, 15 Cal.App.2d 710, 59 P.2d 1063, 1064 (1936)). A statement is substantially true if it would have the same effect on the mind of the reader or listener as that which the pleaded truth would have produced. *Id.* The plaintiff has the burden of proving falsity in order to establish a successful defamation claim. *Crawley*, 819 N.W.2d at 104.

 Viewing the evidence here in a light most favorable to Dr. McKee, we conclude that there is no genuine issue of material fact as to the falsity of Statements 1, 2, and 4. As to Statement 1 (Dr. McKee said he had to "spend time finding out if you transferred or died."), Dr. McKee described his account of the statement in his deposition testimony:

> I made a jocular comment ... to the effect of I had looked for [Kenneth Laurion] up in the intensive care unit and was glad to find that, when he wasn't there, that he had been moved to a regular hospital bed, because you only go one of two ways when you leave the intensive care unit; you either have improved to the point where you're someplace like this or you leave because you've died.

In light of the substantial similarity between Statement 1 and Dr. McKee's account, we conclude that any differences between the two versions are nothing more than "minor inaccuracies" that cannot serve as a basis for satisfying the falsity element of a defamation claim. *Masson*, 501 U.S. at 516, 111 S.Ct. 2419. Here, the "gist" or "sting" of Laurion's and Dr. McKee's versions are the same. *Id.* at 517, 111 S.Ct. 2419. Both communicate the notion that patients in the intensive care unit who have suffered a hemorrhagic stroke leave the intensive care unit either because they have been transferred to a regular room or they have died. Therefore, "the substance" of Statement 1 is justified given the similarity of the two versions. *Id.* In other words, Dr. McKee's account of what he said would produce the same effect on the mind of the reader as Statement 1. The minor inaccuracies of expression in Statement 1 as compared to

Dr. McKee's version of what he said do not give rise to a genuine issue as to falsity. For these reasons, we conclude that there is no genuine issue of material fact as to the falsity of Statement 1.

 As to Statement 2 (Dr. McKee said, "Well, 44% of hemorrhagic strokes die within 30 days. I guess this is the better option."), Dr. McKee acknowledged in his deposition that during the examination of Kenneth Laurion, he communicated to those present that some ICU patients die. However, he denies referencing a specific percentage. Thus, Dr. McKee posits that Statement 2 is false, or that, at the least, there is a genuine issue of material fact as to the falsity of Statement 2 because he never stated a specific percentage. The problem for Dr. McKee with respect to Statement 2 is that the gist or sting of Statement 2 is the mention of hemorrhagic stroke patients dying and not the percentage referenced. Statement 2 squarely satisfies the test for substantial truth because it would have the same effect on the reader regardless of whether a specific percentage is referenced (or whether the percentage is accurate). *See Masson,* 501 U.S. at 517, 111 S.Ct. 2419. The presence or absence of a specific percentage within Statement 2, without more, has no bearing on how a reader would perceive the statement because the gist or sting of Dr. McKee's reference to death does not change based on the statistical reference. Nor does the presence, absence, or inaccuracy of the stated percentage, without more, cast Dr. McKee in a more negative light than does his discussion of patients dying. That is especially true when the reader is given no context for the statistics. Therefore, we conclude that there is no genuine issue of material fact as to the falsity of Statement 2.

 As to Statement 4 (Dr. McKee said, "That doesn't matter" that the pa-

tient's gown did not cover his backside.), Dr. McKee testified that he told the patient that the gown "looks like it's okay" because it did not appear that the gown was at risk of falling off. We are not persuaded that there is any meaningful difference between the two versions of the statements sufficient to create a genuine issue as to the falsity of Statement 4. The substance or gist of the two versions is the same. Commenting that the gown "looks like it's okay" is another way of communicating that "it didn't matter" that the gown was not tied in the back. Thus, any inaccuracy of expression does not change the meaning of what Dr. McKee admits to having said. For these reasons, we conclude that Statement 4 is not actionable.

*Statements 3, 5, & 6*

 Next, we consider whether Statements 3, 5, and 6 are capable of conveying a defamatory meaning. In order for a statement to be defamatory, it must tend to "harm the plaintiff's reputation and ... lower him in the estimation of the community." *Stuempges,* 297 N.W.2d at 255. In the context of libel, "a publication may be defamatory on its face; or it may carry a defamatory meaning only by reason of extrinsic circumstances." *Utecht v. Shopko Dept. Store,* 324 N.W.2d 652, 653 (Minn.1982). The question of whether a statement's language reasonably conveys a defamatory meaning is one of law. *Id.* Whether a defamatory meaning is conveyed depends upon how an ordinary person understands "the language used in the light of surrounding circumstances." *Gadach v. Benton Cnty. Co–op. Ass'n,* 236 Minn. 507, 510, 53 N.W.2d 230, 232 (1952). In deciding whether the words bear an innocent meaning, the words "must be construed as a whole without taking any word or phrase out of context." *Morey v. Barnes,* 212 Minn. 153, 156, 2 N.W.2d 829,

831 (1942). If the words are capable of conveying a defamatory meaning, it is for the jury to decide whether they were in fact so understood. *Utecht*, 324 N.W.2d at 654.

We conclude, as a matter of law, that Statements 3, 5, and 6 are not capable of conveying a defamatory meaning. Statement 3 was published as follows: "Dr. McKee said, 'Therapists? You don't need therapy.'" We fail to see how this statement, standing alone, is capable of a defamatory meaning that would harm Dr. McKee in the eyes of the community. By itself, Statement 3 is harmless. Doctors routinely evaluate whether therapy is appropriate for a given patient. Reading Statement 3 in the context of the entire posting, *see Morey*, 212 Minn. at 156, 2 N.W.2d at 831, we reach the same conclusion. The posting is silent as to Kenneth Laurion's actual need, if any, for therapy after his stroke. Given that neurologists routinely evaluate whether a patient does or does not need therapy and the posting's silence as to whether Kenneth Laurion actually needed therapy, we fail to see how Statement 3 could harm Dr. McKee's reputation. Simply put, there are no facts in the posting, or in the record before us for that matter, that provide a context in which Statement 3 is capable of lowering Dr. McKee in the estimation of the community. *See Stuempges*, 297 N.W.2d at 255. Presumably, the purpose of Dr. McKee's visit was to evaluate Kenneth Laurion's condition. Given this purpose, a determination as to whether or not Kenneth Laurion needed ongoing therapy was appropriate. Therefore, we reject Dr. McKee's assertion that the statement calls into question his competency as a physician. We also reject the notion that, in the light of surrounding circumstances, Statement 3 is capable of conveying a defamatory meaning as published and conclude that it is not actionable as a matter of law.

Statement 5 was published as follows: "Five minutes later, Dr. McKee strode out of the room. He did not talk to my mother or myself." Laurion argues that Statement 5 is true because Dr. McKee did not stop to chat, provide reassurance, or report to the family regarding Kenneth Laurion's condition. Dr. McKee asserts that, although he admitted during his deposition that he did not talk with Laurion or his mother when he finished examining Kenneth Laurion, the statement is false because Laurion admitted in his deposition that Dr. McKee said to the Laurion family, "you can go back in," after leaving the hospital room. In the end, any dispute as to whether Dr. McKee spoke with Laurion or his mother upon leaving the room is not material because we conclude that Statement 5 is not capable of conveying a defamatory meaning.

As with Statement 3, taking "the language used in the light of surrounding circumstances," *Gadach*, 236 Minn. at 510, 53 N.W.2d at 232, we fail to see how Statement 5 is reasonably capable of conveying a defamatory meaning that would harm Dr. McKee's reputation and "lower him in the estimation of the community." *Stuempges*, 297 N.W.2d at 255. In the context of the posting as a whole, there is no indication whether Dr. McKee's choice not to speak to the family was justified based on how busy he was, whether he returned to speak with the family later, or whether he was attending to a time-sensitive matter when he went to the nurse's station. Moreover, Dr. McKee's own deposition testimony demonstrates the innocuous nature of Statement 5. When asked whether it is common practice to stop and speak to the spouse of the patient after a medical evaluation, Dr. McKee logically explained that "it depends on whether or

not I think the patient has understood ... the information at hand and [is] able to relate it." Dr. McKee continued: "If I've just explained things to a patient who seems to understand well and expect that the family will be going in shortly thereafter, I wouldn't necessarily ... repeat the entire conversation to a family member...." Given Dr. McKee's own testimony, in addition to the context in which Statement 5 was published, we conclude that the statement is not capable of conveying a meaning that would lower Dr. McKee in the estimation of the community. Accordingly, we conclude that Statement 5 is not actionable.

Statement 6 was published as follows: "When I mentioned Dr. McKee's name to a friend who is a nurse, she said, 'Dr. McKee is a real tool!'" The parties dispute whether Statement 6 is protected opinion. The First Amendment protects statements of pure opinion from defamation claims. *Diesen v. Hessburg,* 455 N.W.2d 446, 450 (Minn.1990) (citing *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–40, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)). Referring to someone as "a real tool" falls into the category of pure opinion because the term "real tool" cannot be reasonably interpreted as stating a fact and it cannot be proven true or false. *See Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 19–20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). We conclude that it is an opinion amounting to "mere vituperation and abuse" or "rhetorical hyperbole" that cannot be the basis for a defamation action. *See id.* at 17, 20, 110 S.Ct. 2695; Restatement (Second) of Torts § 566 cmt. e (1977) (explaining that people often engage in name-calling "without any real intent to make a defamatory assertion, and it is properly understood by reasonable listeners to amount to nothing more").

Nonetheless, the assertion that a nurse told Laurion that Dr. McKee is a "real tool" is one of fact because whether a nurse actually made the statement to Laurion is an assertion that can be proven true or false. Dr. McKee argues that Laurion's possible fabrication of the existence of the nurse, and thus the statement attributed to the nurse, creates a genuine issue of fact as to the falsity of Statement 6. As described above, Laurion's assertion that the nurse made the statement to him and the implicit assertion that the nurse exists are susceptible to proof. We nevertheless conclude that even though Statement 6 includes a factual assertion that can be proven true or false, Statement 6 is not actionable because the statement is incapable of conveying a defamatory meaning. First, the part of the statement that can be proven true or false—whether a nurse made the statement to Laurion—does not itself place Dr. McKee in a negative light even if it is false. The assertion that a nurse made the statement only has the potential to cast Dr. McKee in a negative light when combined with the second part of the statement—that Dr. McKee is a "real tool." However, attributing the statement to an unidentified nurse does not add defamatory meaning to the statement. *See Seelig v. Infinity Broad. Corp.,* 97 Cal.App.4th 798, 119 Cal.Rptr.2d 108, 118 (2002) (noting that the attribution of a vague, derogatory statement to the plaintiff's ex-husband did not make the statement actionable). Because, as discussed above, the assertion that Dr. McKee is a "real tool" is an opinion that is not susceptible to proof and is therefore not actionable, and because the first part of Statement 6—that a nurse made the statement—does not cast Dr. McKee in a negative light, Statement 6 as a whole is not actionable.

As a final matter, a review of Laurion's online posting as a whole does not change our holding in this case. Given the reason-

ing underlying our conclusion that the six individual statements at issue are not actionable, it would defy logic to conclude that the posting, when viewed as a whole, is somehow actionable. Therefore, we reject any argument that the totality of Laurion's statements makes his online posting actionable.

Because the six statements at issue, viewed individually or in the context of the entire posting, are not actionable, we conclude that the district court properly granted summary judgment in favor of Laurion.

Reversed.

WRIGHT, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.